# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA  :
           :
           :
v.          :   CRIMINAL NO. 3:05CR67 (MRK)
           :
           :
TYRONE HILL      :

## <u>MEMORANDUM OF DECISION</u>

Defendant Tyrone Hill, a convicted felon, is charged in a four-count Indictment [doc. #1] with: (1) being a felon in possession of a .410 gauge sawed-off shotgun and .410 caliber shotgun ammunition, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 924(c)(1)(B)(i); (2) possession of an unregistered sawed-off shotgun, in violation of 26 U.S.C. §§ 5841, 5845(a)(2), 5861(d), and 5871; (3) being a felon in possession of seven rounds of PMC .45 caliber Colt ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and (4) being a violent felon in possession of body armor, in violation of 18 U.S.C. §§ 931(a)(1) and 924(a)(7). Mr. Hill has moved to suppress the seven rounds of ammunition and the bulletproof vest, both of which police found when they went to the home of Krysta Littlejohn, Mr. Hill's then-girlfriend, to arrest Mr. Hill for various charges, including assault. He also moves to suppress the sawed-off shotgun and shotgun ammunition, which police found in a truck parked across the street from Ms. Littlejohn's apartment. *See* Motion to Suppress [doc. # 18].

At Mr. Hill's request, the Court held an evidentiary hearing on his motion to suppress. Mr. Hill and Ms. Littlejohn testified, as did three detectives present on the night of Mr. Hill's arrest. *See* Witness List [doc. #25]. The Court also received into evidence several documents, including an

affidavit Mr. Hill had submitted in support of his motion to suppress.  *See* Exhibit List [doc. #26];
Supplemental Memorandum in Support of Motion to Suppress Evidence [doc. #28] App. at Def.'s
Exs. 1A and 1B.  The parties also submitted post-hearing briefs.  *See* Supplemental Mem. in Supp.
of Mot. to Suppress Evidence [doc. #28]; Government's Post-Hearing Memorandum in Opposition
to Motion to Suppress [doc. #29].  After careful consideration of the parties' arguments, the Court
DENIES Mr. Hill's Motion to Suppress [doc. #18].

## I.

The facts relevant to the Motion to Suppress are as follows.  On July 10, 2004, Bridgeport,
Connecticut police received a report of a shooting.  Police arrived at the hospital where the victim,
Desmond Billups, was being treated for a gunshot wound to his abdomen.  Mr. Billups and several
eyewitnesses to the shooting told the police in sworn statements that the shooter was Tyrone Hill.
Both Mr. Billups and the witnesses were also shown photo arrays and positively identified Mr. Hill
as the person responsible for the shooting.  Several witnesses told police that Mr. Hill had fled the
scene of the shooting in a red and gray pickup truck, Connecticut marker No. 2CX270, with
lawnmowers in the back.  *See* Gov't Ex. 1A at 2; Gov't Ex. 1B at 2.  On July 29, Bridgeport police
obtained an arrest warrant for Mr. Hill that included charges of Assault in the First Degree, Criminal
Use of a Firearm, Carrying a Pistol without a Permit, and Reckless Endangerment in the First
Degree.  *See* Gov't Ex. 2.

### A.    The Arrest

Bridgeport police say they received word on August 2, 2004, from a confidential informant
that Mr. Hill had been seen at the home of his then-girlfriend, Krysta Littlejohn, at 42 McPadden
Drive in Stratford, Connecticut.  At the suppression hearing, Bridgeport Detective Todd Toth

2

testified that the confidential informant also advised police that Mr. Hill had been seen with weapons and that he kept two pistols on him at all times. At around 9 p.m. (according to Mr. Hill) or 10 p.m. (according to Bridgeport police) on August 2, 2004, Bridgeport police, along with multiple Stratford officers, went to 42 McPadden Drive to arrest Mr. Hill. Several officers gathered outside the front door, while others went to the back of the home. Detective Toth then knocked on the front door and identified himself as a police officer. Mr. Hill testified that he looked out the window and saw police standing outside the front door.

Both parties agree that Mr. Hill opened the door and that he was taken into custody and arrested without incident. However, exactly how the arrest was effectuated is the subject of some dispute. At the hearing, Mr. Hill testified that he opened the inside door to Ms. Littlejohn's home, which opens into her living room, and that while police were holding open the outside screen door, he stepped through the doorway and towards the police, attempting at the same time to close the inside door behind him. Mr. Hill says he was then bumped in the chest by a police officer, who put a gun to Mr. Hill's head and pushed him back through the still-open door and into the living room. Detective Toth testified that Mr. Hill opened the door and stood in the doorway. Detective Toth then stepped through the doorway and into the living room of the residence in order to turn Mr. Hill around and handcuff him. According to Detective Toth, Mr. Hill never exited or attempted to exit the residence. Detective Toth denied putting a gun to Mr. Hill's head, though he acknowledged that he and his colleagues had their weapons drawn and at their sides when Detective Toth knocked on the front door to Ms. Littlejohn's home. Both sides agree that once inside the residence, police handcuffed Mr. Hill without incident.

### B.        The Initial Search

Ms. Littlejohn's home is modest in size, as is her living room, which is only approximately ten or twelve feet by ten or twelve feet.  At the hearing, Detective Toth and Detective Louis Cortello, who was also present at the time of the arrest, testified that as Detective Toth was arresting Mr. Hill, the officers saw seven bullets sitting on an entertainment center located in the living room and only approximately five feet from where Mr. Hill was standing.  The officers testified that the bullets were in plain view as they looked around the living room. Neither Mr. Hill nor Ms. Littlejohn disputed the detectives' account, and Mr. Hill's attorney conceded at the hearing that the bullets were in plain view of the officers once they were inside Ms. Littlejohn's home.

Police also found a bulletproof vest lying on a couch located directly adjacent to the front door, and only two to three feet from where Mr. Hill was standing as Detective Toth placed him in handcuffs.  Mr. Hill testified that his cousin had brought the bulletproof vest to Ms. Littlejohn's home a couple of days before the arrest and had left it for Mr. Hill while he was not there. According to Mr. Hill, Ms. Littlejohn believed the vest was an umpire's vest, for use in the youth softball games that Mr. Hill organized, and she left it on the couch for Mr. Hill.  When Mr. Hill saw the vest, he knew what it was and placed a sheet over it, making the vest impossible to see. According to Mr. Hill, police found the vest only after lifting the sheet that had covered it.  Ms. Littlejohn testified differently. She said that Mr. Hill's cousin brought the vest to her home on the day of Mr. Hill's arrest – indeed, only a few hours before the arrest – and that she thought it was an umpire's vest.  She also testified that while she had thrown sheets and blankets from the laundry on the couch, she did not know whether they were covering the vest at the time of Mr. Hill's arrest.

The police deny that there was any sheet covering the bulletproof vest.  Detectives Toth and

4

Cortello testified that they saw the vest sitting on the couch in plain view.  However, neither detective saw the vest until it was pointed out to them by another officer, and they could not rule out the possibility that the other officer had removed a sheet before alerting them to the vest.  As a result, the witnesses at the hearing could not directly confirm or refute Mr. Hill's claim that the vest had been covered by a sheet when the officers entered the living room.

C.    **The Full Search**

Ms. Littlejohn was in her upstairs bedroom when police knocked on the door and entered her home.  Detective Toth testified that Ms. Littlejohn arrived downstairs within a minute or so thereafter, as police were conducting a protective sweep of the home.  Both Detectives Toth and Cortello testified that Ms. Littlejohn gave oral consent for a search of her home, and that approximately half an hour later she confirmed her oral consent by signing a written consent form.  According to police, Ms. Littlejohn was cooperative, and no coercion was used to obtain her consent.

Mr. Hill maintains that Ms. Littlejohn did not come downstairs until about half an hour after police arrived, after the officers had already conducted a full search of the downstairs areas.  Ms. Littlejohn testified that she came downstairs twenty to thirty minutes after she initially heard a knock on the front door.  Frankly, the Court finds the claims of Mr. Hill and Ms. Littlejohn difficult to believe, since Ms. Littlejohn's home is quite small and it is impossible for the Court to believe that Ms. Littlejohn did not hear the noise of the numerous officers who were gathered in her living room to arrest Mr. Hill.  In any event, Ms. Littlejohn says that when she first saw the living room, it was in a state of disarray, with clothes strewn about and couch cushions thrown back.  She also says that police did not ask for her consent until after they had already searched her home.  She claims that she asked the officers whether they would return, and when they said they would not, she signed the

5

consent form and the officers then left.

### D.        The Search of the Truck

Police noticed that the red and gray pickup truck identified by witnesses to the shooting of Mr. Billups was parked across the street from Ms. Littlejohn's apartment on the night of August 2. Mr. Hill did not deny that he drove the truck away from the scene of Mr. Billups's shooting.   Mr. Hill testified that the truck was owned by his mother and that he made no payments on the purchase price for the truck.  According to Mr. Hill, though his mother usually drove the truck, she was often unable to drive, and despite the fact that he lacked a driver's licence, he regularly borrowed the truck with his mother's permission.  When Mr. Hill borrowed the truck for use at a paying landscaping job, he would give his mother a portion of the money he earned to compensate for wear and tear on the truck.

Mr. Hill testified that his mother left the truck parked in front of Ms. Littlejohn's apartment while his mother was away on vacation and that she entrusted the keys to Ms. Littlejohn.  On the day of his arrest, Mr. Hill borrowed the truck to drive to his fourteen-year-old cousin's house.  According to Mr. Hill, his cousin was agitated and showed Mr. Hill a bag containing  a sawed-off shotgun and shotgun shells.  Not wanting to leave the gun in the hands of a teenager, Mr. Hill took the bag with him with the intention of later destroying the gun.  Mr. Hill said he threw the bag under the truck's seat and drove back to Ms. Littlejohn's apartment for dinner. Mr. Hill testified at the hearing that he also intended to persuade Ms. Littlejohn to lend him the truck so that he could drive the four or five miles to his home.  He said that if he could not persuade Ms. Littlejohn to loan him the truck, he would have obtained a ride from a friend.  By contrast, Ms. Littlejohn testified that Mr. Hill had

permission from his mother to drive the truck on the day of his arrest.

After Mr. Hill's arrest, police obtained the keys to the truck. Mr. Hill claims the keys were on the dining room table in Ms. Littlejohn's kitchen, while Detective Toth asserts that they were in the pocket of Mr. Hill's shorts. Detective Toth testified that he decided to seize the truck because it had been used on the night of the shooting and had been identified by several witnesses. Detective Toth also testified that the truck was illegally parked, with two tires on the grass.

While waiting for a tow truck to arrive, Detective Thomas Tenn (who testified at the suppression hearing) and a Stratford detective performed an inventory search on the pickup truck, as required by official Bridgeport Police Department policy. Bridgeport's written Inventory Tow Policy provides as follows:

> BRIDGEPORT POLICE DEPARTMENT INVENTORY TOW POLICY
> 4.5a.1  PURPOSE: To establish a standard policy and procedure for the inventorying of all vehicles taken into police custody.
> 4.5a.2  GENERAL: The United States Supreme Court has rendered a number of decisions which recognize the right of police agencies to inventory motor vehicles that have been impounded in order:
>> a.   To protect the owner's property while it remains in police custody.
>> b.   To protect the police against claims or disputes over lost or stolen property while it remains in police custody.
>> c.   To protect the police from potential danger.
> 4.5a.3  The Department has adopted this practice of securing and inventorying an automobile's contents as a routine policy and procedure. Any contraband or other items of evidential nature discovered during an inventory will be considered to have been discovered incidental to that inventory.
> 4.5a.4  All motor vehicle inventories will be conducted in accordance with the guidelines established in this policy. The policy shall not be used as a subterfuge to circumvent the need to establish probable cause where the securing of a search warrant is indicated.
> 4.5a.5  POLICY: It shall be the policy of the Bridgeport Police Department to inventory all motor vehicles that are taken into police custody.
> 4.5a.6  POLICE CUSTODY: A vehicle is to be considered to be in police custody when impounded as evidence, incidental to an arrest, or whenever the

Department maintains a continuing responsibility for the safekeeping of the vehicle and its contents. An inventory should not be conducted unless the Department assumes responsibility for the vehicle. For example, in ordinary accidents a vehicle does not have to be inventoried solely because it may be towed away. In such circumstances, the towing firm assumes liability for the vehicle and its contents.

4.5a.7   PROCEDURE: A vehicle taken into police custody will be inventoried as soon as practical. The vehicle does not have to be immediately inventoried at the point of seizure, but may be taken to a more convenient or secure place (e.g. Police Headquarters . . .).

4.5a.8   Property or contraband seized for its evidential value or of obvious high dollar value should be removed from the vehicle and appropriately placed into the Department's property unit for safekeeping.

4.5a.9   If while conducting an inventory of a vehicle, an officer discovers a closed container whose contents he/she is unable to determine from merely examining the exterior, the officer should use his/her reasonable judgment in determining whether or not to open said container. (Florida v. Wells 495 U.S., 109 l. Ed. 2nd 1, 1990).

4.5a.10  The Officer charged with the responsibility of inventorying a vehicle in policy custody shall complete the standard "Vehicle Inspection/Inventory Form." . . .

Supplemental Mem. in Supp. of Mot. to Suppress Evidence [doc. #28] Ex. 1A. At the hearing, Detective Toth confirmed that the purpose of conducting an inventory is to protect the owner's property, to protect the police and the towing company from false claims of missing items by the vehicle's owner, to protect the vehicle from damage, and to protect the police from any dangerous items that may be in the vehicle.

While conducting their inventory search of the truck, detectives found the backpack, and looking inside the backpack, discovered the shotgun and .410 caliber shotgun shells inside it. The detectives removed the bag from the truck. Mr. Hill claims that police also removed a ceremonial sword. Detective Tenn testified that he did not recall finding any other items in the truck besides the backpack. Because the detectives did not have an inventory form handy, they sent a patrolman (who was not involved in the initial inventory search) to fetch and complete a Bridgeport Police

Department Vehicle Impound Form, the department's official inventory form.  A copy of the form was submitted into evidence.  *See* Gov't Ex. 8A.  The form is filled in with vehicle owner information, a vehicle description, information regarding vehicle damage, and check marks indicating that the vehicle contains a radio, tape deck, and keys, but the "Vehicle Inventory" section, in which personal items found in the vehicle are to be listed, is blank.

Mr. Hill was tried in state court on charges arising from the shooting of Mr. Billups.  Mr. Hill did not deny the shooting but claimed it was in self defense.  The jury acquitted Mr. Hill.  He was then indicted on the federal charges that give rise to this action.

## II.

### A.      The Seizures from Ms. Littlejohn's Home

Mr. Hill claims that the bullets and bulletproof vest seized from Ms. Littlejohn's home must be suppressed because police lacked authority to enter the home on August 2.  As a threshold matter, the Court must first consider whether Mr. Hill has a basis for challenging the seizure of these items under the Fourth Amendment.  Because Fourth Amendment rights are "personal rights," they "may not be vicariously asserted."  *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978).[1]  The Supreme Court has held that "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the amendment has a legitimate expectation of privacy in the invaded place."  *Id.* at 143.  "To contest the validity of a search, a defendant must demonstrate

---

[1] In its original brief, the Government referred to this inquiry as a question of "standing," but in *Rakas*, the Supreme Court rejected "standing" as the proper mode of analysis.  "Central to [the Supreme Court's] analysis was the idea that in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the 'definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than that of standing.'"  *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (quoting *Rakas*, 439 U.S. at 140).

that he *himself* exhibited an actual subjective expectation of privacy in the area searched, and that this subjective expectation is one that society is willing to accept as reasonable." *United States v. Fields*, 113 F.3d 313, 320 (2d Cir. 1997).   A defendant bears the burden of demonstrating that a protectable Fourth Amendment interest was implicated by the allegedly improper search. *See United States v. Pena*, 961 F.2d 333, 336 (2d Cir. 1992).

Mr. Hill does not claim that he owned or rented Ms. Littlejohn's apartment.  However, "a defendant's lack of [a possessory] interest does not rule out the possibility that he may still show a reasonable expectation of privacy." *Fields*, 113 F.3d at 320; *see Rakas*, 439 U.S. at 142 ("[A] person can have a legally sufficient interest in a place other than his own home so that the Fourth Amendment protects him from unreasonable government intrusion into that place."). In *Minnesota v. Olson*, 495 U.S. 91 (1990), the Supreme Court held that an overnight guest had a reasonable expectation of privacy in the premises in which he was staying.  The Court noted that a houseguest "is there with the permission of his host, who is willing to share his house and his privacy with his guest," *id.* at 99, and concluded that the houseguest's privacy "was rooted in 'understandings that are recognized and permitted by society,'" *id.* at 100 (quoting *Rakas*, 439 U.S. at 144 n.12).  Eight years later, in *Minnesota v. Carter*, 525 U.S. 83 (1998), the Supreme Court held that defendants, who were in another's apartment for a limited time and solely for the purposes of bagging cocaine, had no reasonable expectation of privacy in the premises.  Crucial to the Supreme Court's conclusion in *Carter* were "the purely commercial nature of the transaction engaged in . . ., the relatively short period of time on the premises, and the lack of any previous connection between [defendants] and the householder." *Id.* at 91.

The evidence presented at the suppression hearing convinces the Court that the present case

is closer to the facts of *Olson* than to those of *Carter*. At the time of his arrest, Mr. Hill and Ms. Littlejohn had been dating, on and off, for approximately eighteen years and had lived together for long stretches of time. According to his testimony, Mr. Hill was a frequent houseguest at Ms. Littlejohn's home, often staying the night. Ms. Littlejohn testified that on average, Mr. Hill spent the night in her home once or twice a week. On August 2, Mr. Hill spent most of the afternoon at Ms. Littlejohn's residence, leaving only briefly to visit his cousin and returning for dinner. He remained in Ms. Littlejohn's home until police arrived at 9 p.m. (according to Mr. Hill) or 10 p.m. (according to the police). Though Mr. Hill testified that he did not intend to spend the night in Ms. Littlejohn's home on the evening he was arrested, both his testimony and Ms. Littlejohn's establish that Mr. Hill was a frequent and welcomed guest with something approaching a standing invitation to visit and stay the night. *See Fields*, 113 F.3d at 321 ("[W]e do not think whether a guest spends the night is dispositive."). Given the purely social nature of Mr. Hill's visits – both in general and on the night of August 2 in particular – the fact that he had stayed for many hours that day, and the fact that he and Ms. Littlejohn had a close, longstanding personal relationship, the Court finds that Mr. Hill had a reasonable expectation of privacy in Ms. Littlejohn's home. In this regard, the Court notes that even the Government does not deny that on the basis of the information in its possession, Mr. Hill was entitled to raise a Fourth Amendment challenge to police seizure of the items from Ms. Littlejohn's home.

The Court turns next to the merits of Mr. Hill's contention that police had no right to enter Ms. Littlejohn's home. Mr. Hill's argument is based on his testimony that he had begun to exit through the front door when police forced him back into the living room, despite the fact that "[h]e did not resist [arrest] or give any indication that he intended to resist or to flee the scene."

Memorandum in Support of Motion to Suppress Evidence [doc. #19-1] at 3.  Mr. Hill maintains that police, knowing they lacked a warrant to search 42 McPadden Drive, pushed him into the home because they wished to search it and knew that they could do so if the search were found to be incident to Mr. Hill's arrest.  *Id.* at 4 ("[P]olice officers . . . forced Mr. Hill back into the living room at gunpoint in order to effect a search of that area.").  According to Mr. Hill, because the search inside Ms. Littlejohn's home was made possible only by the police officers' illegitimate machinations, all evidence found in the home should be suppressed.

On the facts presented, the Court believes the police acted reasonably in effecting Mr. Hill's arrest just inside the threshold of Ms. Littlejohn's residence.  Several factors lead the Court to this conclusion.  As an initial matter, there is no doubt that if Officer Toth's version of the arrest is credited  – so that he had to take a step into the residence in order to turn Mr. Hill around and handcuff him – Detective Toth's presence in the living room would be proper.  In this regard, the Court notes that in his affidavit supporting his motion to suppress, Mr. Hill stated, "I was taken into custody at the threshold of the residence," Affidavit dated August 30, 2005 [doc. # 22], an account that is consistent with Detective Toth's testimony at the suppression hearing.

However, even if the Court were to accept Mr. Hill's suppression hearing testimony that he stepped out the front door and onto the front step before being forced back into the home, Mr. Hill conceded that he did not close the door behind him, and the situation involving his arrest was certainly a fluid one, with Mr. Hill moving in one direction and police in another.  In these circumstances, the Court declines to resolve the suppression motion based on whether Mr. Hill was one step inside the open door or one step outside of it at the time of his arrest.  *See United States v. Gori*, 230 F.3d 44, 54 (2d Cir. 2000) (warning that a court should not "employ[] 'metaphysical

subtleties' to resolve Fourth Amendment challenges" (citing *Frazier v. Cupp*, 394 U.S. 731, 740 (1969))); *see also* 3 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 6.1(3) (4th ed. 2004), at 302 (cited with approval in *Gori*) (opining that allowing the lawfulness of a warrantless arrest to turn on whether the defendant was just inside the threshold, at it, or just outside it "is unsound from the standpoint of both principle and pragmatism"); *id.* at 303 ("[E]ven if courts could be expected to sort out the 'in' – 'at' and 'on' – 'by' distinctions on a regular basis, one cannot help but wonder why that burden should be imposed upon them.").

In the Court's view, the police had strong reasons to complete Mr. Hill's arrest by stepping through the doorway of Ms. Littlejohn's home and into her living room.  According to Mr. Hill's account, he was advancing towards the police, who could only have been wary of his intentions, in light of the fact that Mr. Hill was a convicted felon who was suspected of having shot Mr. Billups with a handgun and who was reported by a confidential informant to carry two guns at all times.  As police moved quickly to intercept him, the momentum of several officers advancing on a suspect would naturally have taken them across the threshold and a few steps into the residence. Additionally, from the photographs of Ms. Littlejohn's home submitted into evidence, it is clear that the so-called "porch area" outside her front door is, in reality, only a small step with an overhang above the door. Otherwise, the front-door area of Ms. Littlejohn's home is fully exposed.  *See* Gov't Exs. 4A and 4B.  Given this precarious position, with a number of officers perched upon a small front step, police were understandably cautious.  For this Court to conclude that police were obligated to effectuate Mr. Hill's nighttime arrest on Ms. Littlejohn's front step – leaving police exposed to anyone lurking in the darkness and ignorant of whether an associate of Mr. Hill's might threaten police from inside the residence – would be the sort of "unrealistic second-guessing" that

13

the Supreme Court has cautioned against. *United States v. Casado*, 303 F.3d 440, 447 (2d Cir. 2002) (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).

More importantly, having listened to the testimony of the officers and others at the suppression hearing, the Court does not believe that the police deliberately orchestrated Mr. Hill's arrest so as to allow them to search Ms. Littlejohn's home. In support of his claim, Mr. Hill invokes cases in which courts have found searches to be improper because police had manipulated the conditions of arrest so as to maximize their chances of discovering incriminating evidence without a warrant. *See United States v. Hill*, 730 F.2d 1163, 1167 (8th Cir. 1984) ("We question . . . whether law enforcement officers should be allowed to maneuver an arrestee close to personal belongings in order to search all items thus brought within the arrestee's immediate control."); *United States v. Wright*, 577 F.2d 378, 381 (6th Cir. 1978) (noting that "the police cannot justify a search of an entire house by forcibly escorting an arrested person from room to room"); *United States v. Rothman*, 492 F.2d 1260, 1266 (9th Cir. 1973) ("The police cannot circumvent the Fourth Amendment's warrant requirement by arresting a person and then bringing that person into contact with his possessions which are otherwise unrelated to the arrest."). In *Hill*, the defendant was arrested and led outside of the house, which was locked behind him. *Hill*, at 730 F.2d at 1165. When the defendant returned to the house to retrieve some personal items before being transported to jail, police followed him through the house and into his bedroom. *Id.* The police then opened a suitcase located several feet away from where the defendant was standing in his bedroom. On these facts, the Eighth Circuit held that the search could not be justified as incident to the defendant's arrest. *Id.* at 1167. In *Wright*, the Sixth Circuit also held that a search of the defendant's suitcase could not be justified as a search incident to his arrest, as the suitcase was only near him at the time of the arrest because police put

14

the suitcase there. *Wright*, 577 F.2d at 381.  And in *Rothman*, the defendant had been arrested at an

airport and was in custody when his checked luggage was removed from a plane and brought to him.

*Rothman*, 492 F.2d at 1263.  In those circumstances, the Eighth Circuit held that the search of the

defendant's luggage was not conducted as a search incident to his arrest.  *Id.* at 1266.

     The cases cited by Mr. Hill are readily distinguishable from the present case.  In each, the

challenged search was significantly divorced in time from the arrest.  *See, e.g.*, *id.* ("The search

occurred sometime after the arrest. . . .  Here there was no connection at all between the arrest and

the search.").  Also in each, the evidence sought to be suppressed was physically far removed from

where the defendant was arrested. *See, e.g.*, *Wright*, 577 F.2d at 381 ("The only reason the luggage

was anywhere near [the defendant] at the time it was searched was because [the officer] had obtained

the bags and placed them there.").  Thus, the searches could not properly be described as "incident"

to the arrests, either in place or time.  *See Hill*, 730 F.2d at 1167 ("[W]arrantless searches of luggage

or other property seized at the time of an arrest cannot be justified as incident to that arrest either if

the [search is remote in terms of time or distance from the arrest] . . ., or no exigency exists."

(quoting *United States v. Chadwick*, 433 U.S. 1, 15 (1977) (first alteration in original))).  Here, by

contrast, it is undisputed that the handcuffing and arrest of Mr. Hill took place within seconds after

he answered the door and, at most, within a few feet of where Mr. Hill stood when he opened the

door to the police.  Moreover, *Hill*, *Wright*, and *Rothman* each involved a degree of deliberate police

manipulation that is completely absent from the present case.  Even according to Mr. Hill's version

of events, there is no evidence suggesting willful manipulation by the police; instead, Mr. Hill's

argument is based solely on his speculation about the officers' motives.

     Finally, the Court notes that the Supreme Court's decision in *Payton v. New York*, 445 U.S.

573 (1980), is not to the contrary.  Explaining that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," *id.* at 585 (internal quotation marks omitted), the Supreme Court in *Payton* held that "[a]bsent exigent circumstances, that threshold may not reasonably be crossed without a warrant," *id.* at 590.  However, "*Payton* does not hold or suggest that the home is a sanctuary from reasonable police investigation." *United States v. Gori*, 230 F.3d 44, 51 (2d Cir. 2000).  Just as it is reasonable for police to cross the threshold to pursue, without a warrant, a suspect who retreats just inside the vestibule, *see United States v. Santana*, 427 U.S. 40 (1976), it may also be reasonable for police to cross the threshold to effect a valid arrest.  Here, while Mr. Hill had a reasonable expectation of privacy in Mr. Littlejohn's home sufficient to allow him to challenge the seizure of the evidence in question, his privacy interest fell far short of that possessed by the home's actual owner. *See Carter*, 525 U.S. at 90  ("[W]hile it was a 'home' in which respondents were present, it was not their home.").  Moreover, Mr. Hill opened the door to the police, even though he knew they had come to arrest him.  By doing so, he exposed Ms. Littlejohn's living room to police view, reducing further whatever expectation of privacy he might have had. *See Gori*, 230 F.3d at 51 ("Fourth Amendment privacy interests are most secure when an individual is at home with doors closed and curtains drawn tight."); *id.* at 53 ("Once the apartment was opened to public view by the defendants in response to the knock of an invitee, there was no expectation of privacy as to what could be seen from the hall."); *see also Santana*, 427 U.S. at 42 ("While it may be true that under the common law of property the threshold of one's dwelling is 'private,' . . . it is nonetheless clear that under the cases interpreting the Fourth Amendment [the defendant, who had retreated just inside the threshold,] was in a 'public' place. She was not in an area where she had any expectation of privacy.").

As the Supreme Court has explained, "the touchstone of our analysis under the Fourth Amendment is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Maryland v. Wilson*, 519 U.S. 408, 411 (1997) (internal quotation marks omitted). "[R]easonableness depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Id.*; *see N.G. v. Connecticut*, 382 F.3d 225, 231 (2d Cir. 2004) (describing to be an "overarching principle" the fact that "'reasonableness under the Fourth Amendment . . . requires a balancing of the need for the particular search against the invasion of personal rights that the search entails'" (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979) (alteration in original))). Considering that police were "acting in a swiftly developing situation," *Sharpe*, 470 U.S. at 686, at night, with a suspect whom they rightly believed to be armed and dangerous, that there is no evidence police manipulated the circumstances of the arrest, and that Mr. Hill's expectation of privacy at the time of his arrest was diminished, the Court concludes that the police acted reasonably in bringing about Mr. Hill's arrest where they did – one step inside the doorway of Ms. Littlejohn's residence. The police were therefore lawfully in Ms. Littlejohn's living room at the time they discovered the bullets and the bulletproof vest, within moments of the arrest, and within a few feet of where the arrest was effected. *See United States v. Delay*, No. 03-40055-01-SAC, 2003 WL 22327117, at *4 n.3 (D. Kan. Sept. 30, 2003) (explaining that where "officers had authority to execute the warrant at the threshold to the motel room," they were permitted "entry inside the room to complete the arrest" if doing so "was appropriate under the circumstances").

Once the legality of the police presence in Ms. Littlejohn's home is established, it follows that the officers could permissibly seize the bullets sitting on the entertainment center. Mr. Hill has

17

conceded that the bullets were in plain view of the arresting officers, and Detective Toth testified that at the time of the arrest the officers were aware that Mr. Hill was a convicted felon (for whom possession of bullets would be illegal). Therefore, the bullets were lawfully seized. *See United States v. Gamble*, 388 F.3d 74, 76 (2d Cir. 2004) ("The 'plain view' exception authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity." (internal quotation marks omitted)).

Whether the bulletproof vest was in plain view or covered by a sheet at the time of arrest is subject to dispute. The Court does not find credible Mr. Hill's testimony that the vest had been sitting on the couch for days before his arrest, because his account was undercut by Ms. Littlejohn's testimony that the vest had been put there only hours before Mr. Hill's arrest. Therefore, the Court does not credit Mr. Hill's claim that he threw a sheet over the vest several days before the arrest, a fact to which Ms. Littlejohn could not attest. And if there was no sheet covering the vest, it was in plain view when police discovered it. Therefore, seizure of the bulletproof vest was lawful. *See id.*

However, even if the Court were to believe Mr. Hill that the bulletproof vest was covered by a sheet, the Court nonetheless concludes that discovery of the vest by police was still permissible as incident to Mr. Hill's arrest. As the Second Circuit recently instructed, when police arrest an individual, they "may conduct 'a search of the arrestee's person and the area 'within his immediate control' – construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence,' i.e., the 'grab area.'" *United States v. Gandia*, 424 F.3d 255, 261 (2d Cir. 2005) (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)). By Mr. Hill's own admission, the bulletproof vest was lying on a couch only two to three feet away from where he was

18

arrested, easily within his "grab area."  In those circumstances, police were certainly justified in making sure that a large, sheet-covered lump sitting on the couch by Mr. Hill was not hiding a weapon, particularly in light of the confidential informant's admonition that Mr. Hill was known to carry guns with him at all times.  *See United States v. Perea*, 986 F.2d 633, 643 (2d Cir. 1993) (explaining that a search incident to an arrest is properly conducted within the "reasonable reach" of the arrestee).

A properly limited search – like the lifting of a sheet from a lump on a couch two to three feet from a suspect believed to be carrying guns – is permissible, even when a suspect has been handcuffed.  *See United States v. Hernandez*, 941 F.2d 133, 137 (2d Cir. 1991) (upholding a search of the "grab area" around a woman present at the scene of an arrest, even though she had been handcuffed, because it might be possible for her to reach for a hidden gun); *United States v. Helmstetter*, 56 F.3d 21, 23 (5th Cir. 1995) ("The limited restraint [i.e. handcuffs] placed on [the defendant] impeded but did not prevent him from reaching the readily accessible weapon.").  In any event, based upon the testimony at the suppression hearing, the search of the couch occurred virtually simultaneously with Mr. Hill's arrest.  Indeed, Detective Toth testified that an officer pointed the vest out to him after his attention had been focused on Mr. Hill for only fifteen or twenty seconds.  The present situation is thus far different from one in which a defendant is securely handcuffed and fully neutralized as a threat long before police conduct a search for weapons.  *Cf. United States v. Blue*, 78 F.3d 56, 60 (2d Cir. 1996) (finding that a warrantless search was not proper where both suspects were thoroughly secured – in handcuffs, prone on the floor, with their hands fully visible at all times, and guarded by an agent standing over them and three others nearby – before the search was conducted).  Accordingly, the Court concludes that seizure of both the bullets found on the

entertainment center and the bulletproof vest on the couch were proper under the Fourth Amendment, and the Court will not, therefore, suppress that evidence.[2]

### B.        The Seizures from the Truck

Turning next to the seizures from the truck, as a threshold matter, the Government maintains that Mr. Hill has not met his burden of showing that he had an expectation of privacy in his mother's truck such that he may object to the search of the truck on Fourth Amendment grounds.  As the Government acknowledges, the Second Circuit has rejected the proposition "that only the owner of a vehicle may have a Fourth Amendment privacy interest therein that is protected against governmental invasion" and it has held that "the borrower of an automobile can possess such an interest." *United States v. Pena*, 961 F.2d 333, 337 (2d Cir. 1992).  Nevertheless, the Government contends that other factors besides Mr. Hill's lawful borrowing of the truck negate any expectation of privacy he may claim to have.  *See* Gov't's Post-Hearing Mem. in Opp'n to Mot. to Suppress [doc. #29] 6-13.  In particular, the Government  argues that Mr. Hill did not have the right to exclude others from the area searched – and therefore lacked a reasonable expectation of privacy in the truck – because he did not have a set of keys, he had no driver's license, he had to ask permission whenever he used the truck, Ms. Littlejohn was in charge of the truck while Mr. Hill's mother was away, and others used the truck besides Mr. Hill.  *Id.*; *see Rakas*, 439 U.S. at 146 ("[T]here comes a point when use of an area is shared with so many that one simply cannot reasonably expect seclusion." (internal quotation marks omitted)).

_____

[2] Because police found both the bullets and the vest in conjunction with the initial search conducted at the time of Mr. Hill's arrest, it is not necessary to address the parties' arguments regarding the full search of the apartment and whether Ms. Littlejohn consented before or after the search was conducted.

The Court need not resolve the Government's threshold argument.  Even if Mr. Hill had a reasonable expectation of privacy in the truck (a matter that the Court expressly does not decide), the Court concludes that the backpack containing the shotgun and shotgun shells was seized pursuant to a lawful inventory search of the truck.  And Mr. Hill's counsel conceded at oral argument that if police were entitled to seize the backpack as part of a valid inventory search, police were also entitled to look inside the backpack and seize the items within it.  *See United States v. Thompson*, 29 F.3d 62, 65 (2d Cir. 1994) ("Consistent with the Fourth Amendment, law enforcement officials may open closed containers as part of an inventory search so long as they act in good faith pursuant to standardized criteria . . . or established routine." (alteration in original) (internal quotation marks omitted)).

The Government argues that the truck was lawfully seized since it was evidence of the Billups shooting that was in plain view on a public street.  The Court agrees.  A police officer may seize evidence found in plain view without a warrant if three conditions are met:  First, as with "any valid  warrantless seizure of incriminating evidence," it must be true "that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed." *Horton v. California*, 496 U.S. 128, 136 (1990).  Second, "not only must the item be in plain view; its incriminating character must also be immediately apparent."  *Id.* (internal quotation marks omitted).  Third, "not only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she must also have a lawful right of access to the object itself."  *Id.* at 137; *see Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) (reiterating the three conditions for a valid seizure of evidence in plain view); *United States v. Kiyuyung*, 171 F.3d 78, 83 (2d Cir. 1999) (same).

Here, the seizure of the truck satisfies  all three conditions.  The truck was parked on a public

street, visible to all.  Therefore, no Fourth Amendment violation preceded the plain-view disclosure

of the truck to police.  At the hearing, Detective Toth testified that police seized the truck because

police recognized it as the vehicle identified by witnesses to the Billups shooting – in other words,

because its "incriminating nature" was "immediately apparent."  The police had more than probable

cause to believe that the truck was an instrumentality of a crime, as well as evidence of a crime.

After all, eyewitnesses to the Billups shooting told police that Mr. Hill had used the truck to flee the

scene of the shooting.  *See* Gov't Ex. 1A at 2; Gov't Ex. 1B at 2.  Therefore, the truck itself was an

instrumentality of a crime, and its presence across the street from the home where Mr. Hill was

arrested helped to confirm Mr. Hill as the shooter.  *See Harris v. United States*, 390 U.S. 234 (1968)

(finding no illegality in police's decision to seize as evidence a vehicle seen leaving the scene of a

robbery).  Quite understandably,  police did not want to leave the truck sitting on the street at night,

where it could be removed or its contents could be disturbed.  Finally, no impediment to the police's

lawful right of access to the truck existed, since the vehicle was parked on a public street.  *Cf.*

*Horton*, 496 U.S. at 137 (noting that the "lawful right of access" condition would not be met where

"the seizure of . . . cars was accomplished by means of a warrantless trespass on the defendant's

property").  Thus, police properly seized the truck as evidence in plain view.[3]

Although the Second Circuit does not appear directly to have addressed the issue presented

by this case, several other circuits have.  For instance, in *United States v. Cooper*, 949 F.2d 737 (5th

Cir. 1991), police seized a car that was believed to have been used in a convenience store robbery.

---

[3] At the hearing, Detective Toth testified, without contradiction, that the truck was parked
illegally.  The Government argues that "if the Court were to credit the detective's testimony, pursuant
to the police caretaking function, the police could have impounded the car for that reason and then
conducted an inventory search."  Gov't's Post-Hearing Mem. in Opp'n to Mot. to Suppress [doc. #29]
at 15 n.2 (citing cases).  In view of its holding, the Court need not address this argument.

Pursuant to an inventory search of the vehicle, police found a sawed-off shotgun in the trunk.  *Id.*
at 740.  The Fifth Circuit held that the car was properly seized, though police had no warrant to seize
it, because "police may seize a car from a public place without a warrant when they have probable
cause to believe that the car itself is an instrument or evidence of crime." *Id.* at 747.  *See United
States v. Patterson*, 150 F.3d 382, 386-87 (4th Cir. 1998) (upholding the warrantless seizure of a car
seized in plain view as evidence or an instrumentality of a crime); *see also Cooper*, 949 F.2d at 747
n.43, 748 n.44 (citing cases); 3 LaFave, *supra*, § 7.3(a), at 602 n.25 (same).  These decisions fortify
the Court in its conclusion that the seizure of the truck in the circumstances of this case complied
with the Fourth Amendment.

Mr. Hill disagrees.  Citing *Coolidge v. New Hampshire*, 403 U.S. 443 (1971), Mr. Hill argues
that  a vehicle may not be seized as evidence or as an instrumentality of a crime under the plain view
exception to the warrant requirement unless the discovery of the evidence was inadvertent.  In
*Coolidge*, the police obtained a warrant for Edward Coolidge's arrest as a murder suspect and a
warrant to search his Pontiac.  *Id.* at 447.  After police arrested Mr. Coolidge at home, they
impounded and towed two cars that had been parked in his driveway, including the Pontiac.  *Id.*  Mr.
Coolidge moved unsuccessfully to suppress evidence found in the Pontiac and was convicted.  *Id.*
at 448.  Finding the warrant authorizing the seizure of the car defective, *id.* at 453, a plurality of the
Supreme Court rejected the State's argument that the car was properly seized as evidence in plain
view.  The plurality explained that the plain view exception to the warrant requirement did not apply
unless the "discovery of evidence in plain view [was] inadvertent." *Id.* at 469.  The exception could
not be applied "to the seizure of objects – not contraband nor stolen nor dangerous in themselves –
which the police know in advance they will find in plain view and intend to seize." *Id.* at 471.

23

Because police knew they intended to seize Mr. Coolidge's car, they should have obtained a warrant before seizing it, and the plain view exception did not apply. *Id.* at 472.

Though the plurality opinion in *Coolidge* would appear to support Mr. Hill's position, the Supreme Court has since "made clear that the [plurality's] discussion [of the plain view doctrine in *Coolidge*] is 'not a binding precedent.'" *Horton*, 496 U.S. at 136 (quoting *Texas v. Brown*, 460 U.S. 730, 737 (1983) (opinion of Rehnquist, J.)).   Moreover, in a later decision, the Supreme Court explicitly rejected the proposition that the plain view doctrine includes any "inadvertence requirement" necessitating that police obtain a warrant before seizing evidence in plain view that they expect in advance to find.  *Horton*, 496 U.S. at 137-42.   In *Horton*, the Supreme Court explained that *Coolidge*'s result could have been properly based on the second or third conditions of the plain view doctrine, recited above.  *See id.* at 137 ("[I]n *Coolidge*, the cars were obviously in plain view, but their probative value remained uncertain until after the interiors were swept and examined microscopically."); *id.* (suggesting that the plurality "in *Coolidge* may have rested on the fact that the seizure of the cars was accomplished by means of a warrantless trespass on the defendant's property").  In sum, as the Second Circuit has held,  "there is no 'inadvertent discovery' limitation on the plain view doctrine."  *United States v. Reyes*, 283 F.3d 446, 470 (2d Cir. 2002) (internal quotation marks omitted); *see also* 3 LaFave, *supra*, § 7.3(a), at 600 (recognizing that *Horton* rejected *Coolidge*'s "'inadvertent discovery' limitation").  *Coolidge,* therefore, does not alter this Court's conclusion that the police could lawfully seize a truck believed to be evidence in a crime and sitting in plain view on a public street.

Once the Court determines that the truck was lawfully seized, the next question is whether the police search of the truck's interior was proper.   The Government argues that the backpack

containing the shotgun and shotgun shells was found pursuant to a valid inventory search.  The Court agrees.

When a vehicle is lawfully seized, police may conduct an inventory search of its contents, so long as they do so "according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity," *Florida v. Wells*, 495 U.S. 1, 4 (1990), not as "a pretext concealing an investigatory police motive," *South Dakota v. Opperman*, 428 U.S. 364, 376 (1976). Such standard criteria need not be perfectly devised.  *See Colorado v. Bertine*, 479 U.S. 367, 374 (1987) ("[R]easonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment, even though courts might as a matter of hindsight be able to devise equally reasonable rules requiring a different procedure.").  And the criteria "may be proven by reference to either written rules and regulations . . . or testimony regarding standard practices." *United States v. Thompson*, 29 F.3d 62, 65 (2d Cir. 1994) (internal citations omitted).  Inventory searches "'serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger.'" *United States v. Griffiths*, 47 F.3d 74, 78 (2d Cir. 1995) (quoting *Bertine*, 479 U.S. at 372).  The Bridgeport Police Department lists those very goals as the basis for its Inventory Tow Policy.  *See* Supplemental Mem. in Supp. of Mot. to Suppress Evidence [doc. #28] Ex. 1A.  At the hearing Detective Toth confirmed that on the evening of Mr. Hill's arrest, police conducted the inventory search of the truck for the same reasons.

Nonetheless, Mr. Hill argues that the inventory search was improper because it was not conducted "pursuant to Bridgeport police written policies and procedures." *Id.* at 8.  Bridgeport policy requires officers conducting an inventory search to complete a form detailing information

25

about the vehicle, noting any damage to it, and listing items found within it.  *See id.* Ex. 1A, at ¶ 4.5a.10 ("The Officer charged with the responsibility of inventorying a vehicle in policy custody shall complete the standard 'Vehicle Inspection/Inventory Form.'").  According to Mr. Hill, police failed properly to complete the inventory form, as no items were listed on it under the "Vehicle Inventory" heading, despite the fact that police removed the backpack (and, according Mr. Hill, a ceremonial sword).  The failure to list any items in the inventory therefore shows that the so-called "inventory search" was merely "a pretext 'for a general rummaging in order to discovery incriminating evidence.'" *United States v. Thompson*, 29 F.3d 62, 65-66 (2d Cir. 1994) (quoting *Florida v. Wells*, 495 U.S. 1, 4 (1990)).

The Court is not persuaded that the inventory search was pretextual.  The Vehicle Impound Form appears to have been properly completed.  The form contains a full vehicle description comprising the truck's make, model, year, color, vehicle identification number, and license plate information.  The form notes damage to the driver-side bumper and passenger door of the truck, and it also notes that the vehicle contained a radio, tape deck, and keys.  *See* Gov't Ex. 8A.  Though the backpack containing the shotgun is not listed under "Vehicle Inventory," Detective Toth testified that items removed during an inventory search are not generally listed on the inventory forms.  *See Thompson*, 29 F.3d at 65 ("The existence of . . . a valid [inventory] procedure may be proven by reference to . . . testimony regarding standard practices . . . .") (internal citations omitted).  This practice also explains why no sword was listed on the form, assuming, for the moment, that Mr. Hill's uncorroborated testimony about the existence of the sword were to be believed.

Mr. Hill argues that "No testimony was offered by the government to explain the fact that not one piece of property was listed in the inventory.  The government did not put on a single witness

26

who testified that the vehicle was devoid of any property other than the backpack . . . ." Supplemental Mem. in Supp. of Mot. to Suppress Evidence [doc. #28] at 10.  Mr. Hill is not correct. Detective Tenn testified that he did not recall finding anything in the truck besides the backpack. Just as significantly, Mr. Hill, who took the stand, never testified that there was anything in the truck, apart from the sword, that should have been included on the inventory form.  In sum, there is little more than Mr. Hill's speculation to suggest that the "inventory search was merely a pretext to allow the police an opportunity to search the pickup truck." *Id.*  And on the evidence presented, the Court expressly finds to the contrary. *See Thompson*, 29 F.3d at 66 ("[B]eyond Thompson's bare allegation that the inventory search was a ruse to discover incriminating evidence, there is no evidence in the record that the inventory search was for any other purpose than to protect Thompson's property while in custody with the [police].").

### III.

The Court DENIES Mr. Hill's Motion to Suppress [doc. #18].


IT IS SO ORDERED.


/s/       Mark R. Kravitz
United States District Judge



**Dated at New Haven, Connecticut: November 18, 2005.**

27